Paulino et al versus JF Realty, LLC et al. Good morning, Mr. Bonin. Good morning, Your Honor. Attorney Ronald Bonin for the appellants, Louis Paolino and Maria. Good morning, Your Honor. Obviously, Judge, we've, well, Your Honor, we've put forth three claims of error of the trial judge in this matter. And I just want to start first with the claims of her improperly awarding attorney's fees in this matter. The standard for awarding attorney's fees, obviously, set out in Christenberg Garment versus EEOC. It must be a determination that the case was frivolous, or if we continue to litigate it, it became clear to us that it was frivolous at some point in time. In this case, the plaintiff presented evidence of clean water violations, Judge. The testing performed in December of 2013 by an expert, and the judge rejected the testing saying that the testing location was contributed to by five sources. It was mixed. Right, mixed. It's clear, Judge, it wasn't mixed by five sources. This is a headwall on a property that has two outlets from the defendant's property, and there was also a swale that the defendants created as part of this stormwater pollution prevention plan that would take water from the roadway and pour it into this discharge channel. The testing was taken right at the top of the discharge channel where those two discharge pipes were located and the swale was located, and the testimony was there was little or no discharge coming from the swale at the time the testing was taken. The trial judge said there was five sources contributing to this discharge channel at this point, and there is, further down the discharge channel, there is a source that comes from the roadway, the other side of the roadway, that goes into this discharge channel. That's the finding of fact. Is it by the trial judge that it was mixed? It can be an erroneous finding of fact, Judge. If you look at the evidence. Well, how do you overcome a finding of fact? It can be clearly erroneous, Your Honor. When you look at this photographic evidence that's presented in the trial that shows where the headwalls are located and where these outlets are located that are discharging into this discharge channel. So it's clear that with this, the testing was taken, it was right outside of the discharge channel, and there was only three sources, I mean two sources, Judge. The defendants' outfalls and the swale and the testimony was there was nothing coming from the swale and the swale was created by the defendants. And the testing showed that there was oil and grease of 37 milligrams per liter and there was 55,000 micrograms per liter of number two fuel oil. And there was testimony that that's eight times the level you would see in a high-frequency freeway, and this is a low-use residential area where this facility is located. In addition, the testing that was done by the defendants, which is submitted to DEM in this case, is done at the same exact area. They do their own quarterly testing in the same exact area. And this RIPTES permit contains a multi-section general permit, which requires the defendant to identify where this testing can be done. So the trial judge in this case, I mean there's other required – Do I understand your argument on attorney's fees to be that the district court's conclusion that your case had no merit at least as of the time of the summary judgment rested on errors in the factual conclusions she made as to the merits of your client's case, which is to say she ruled against you after a seven-day trial? Correct. I mean, at the time the case began, how can we anticipate that she's going to find that there's five sources when we believe there's only two sources at that point where the testing is done? What does that have to do with the law on attorney's fees? We would have to find she abused her discretion after she had devoted a great deal of time hearing your case and concluding it had no merit. How can we possibly conclude from that that she abused her discretion? Because the case in fact had merit based upon the testing that was performed,  All right. So if we find that her factual findings are not subject to reversal on clear error review, then your attorney's fees case goes away? I don't believe so, Judge. She has to find that the case was frivolous. Even when the case began, she had not yet excluded the expert report of Dr. Rosene. She only did that sometime in September, halfway through the case. Actually, more than halfway through the case. This is the expert that you hired late and then you came in and you wanted to supplement at a time that the trial judge said it's just too late. Correct, Judge. But she did not exclude that report at the beginning of the trial. She excluded that report more than halfway through the trial, beginning in September. So at that point in time... But you knew you were violating the rules. Blaming it on the trial judge when you're the one who failed to comply with the rules on expert disclosure doesn't seem to get you very far. I'm not blaming the trial judge. I'm pointing out that... Yes, you are. You're saying we didn't know then that she would later decide to exclude a witness because of our violation of the rules. You're looking at whether the claim was frivolous from the outset, Your Honor. Yes, thus far it comes down to we didn't anticipate that she was going to exclude this later evidence. But beyond that, Judge, there was other evidence of Clean Water Act violations. There was ongoing turbidity violations. Exhibit 12 at trial showed that the defendants had 0 percent turbidity compliance in July 2011, 20 percent turbidity compliance in August 2011, 18 percent turbidity compliance in December 2011. And the trial judge in page 54 of her decision said that the turbidity violations were not a violation of the Clean Water Act. The NOV that was the notice of violation that was issued by DEM in this case in March of 2010 was for a single turbidity violation that occurred on a single day. So we presented evidence of uncorrected turbidity violations and the fact that there was no report submitted by the defendant after 2011 to show the turbidity had been corrected in any manner. So there was other evidence just beyond the testing, Your Honor, to show that we had met the requirements of the Clean Water Act. In addition, Judge, the last portion of the argument regarding the attorneys' fees was there was a violation of the transfer permit of how they did it. And there is a rule, Rule 22, that says how they're supposed to transfer the RIPTES permit. There's a list of factors or things they have to do to transfer the permit correctly, and they never did it. And I understand that the appellee's argument is a technical violation. It's a violation. I'm not the one to decide whether a rule is important or not. The rule is in place for a specific reason. They didn't comply with the rules, and that is a violation of the RIPTES permit. To go to the second argument, Judge, about – Clean Water Act violation? A violation of the RIPTES permit can be a Clean Water Act violation, yes, Your Honor. Well, normally it would, but is this kind of violation that you claim a violation of the Clean Water Act? I believe it is, Judge. The rule requires them – someone to be responsible under this RIPTES permit for any violations of the permit. At the time, they did not have the correct owner or operator listed on the permit. So there is a reason the rule exists, because they want someone to be responsible for – and it says you have to have read it, signed that you've read the RIPTES permit, understand it, and you sign it as the owner and operator, and it wasn't done. So there is a purpose for the rule to exist. The purpose is that they can find somebody to respond for it. I think there was somebody responding to these allegations all along. I don't see how anybody was prejudiced by this technical violation. Whether they were prejudiced or not, Judge, the person that was responding may not have been the person that was responsible ultimately. In addition, Judge, in terms of the argument that the actual judgment is against the great weight of the evidence, there was also testimony that they didn't keep any maintenance records regarding the maintenance performed on this system between 2010 and 2013, and it showed that there was no maintenance performed on the system during that period of time. So their failure to do or document the required maintenance is also a violation of the multi-sector general permit and a violation of the RIPTES permit. They were required to show that they were doing this maintenance, and then they hadn't done it. So all of those things showed that the plaintiffs actually had made a case under the Clean Water Act. They had shown the testing provided, the testing that they had done, showed that there was a violation of the water quality standards. You're talking about the mixture. The mixture. There was TPH and oil and grease in the water. Well, Snyder, I believe his name was, testified that when he went to test, he found that there was a mixture of waters that were supposed to be clean, those that didn't make any difference. I'm sorry, Your Honor. Snyder testified that he did testing right outside the outfalls, and that the only flow that was coming was from the outfalls, and there was a small amount of flow from a swale that was coming from the road. That's what he testified to. So there was two, he testified specifically that he did this testing upstream of where the other things were contributing to this discharge panel, discharge channel, and he found that there was TPH and oil and grease in the water. But that water was coming through current road through a drainage channel that had been mixed with LKQ water. He was testing LKQ water that was coming from their discharge from the headwall of their system that discharges the water from their stormwater pollution plant, right outside the discharge of their headwall. That's what he was testing it from. So the only thing that was contributing to where he was testing it was the headwall and this swale. This channel runs along the road, right in front of both of their properties. So the other discharge is all downstream of where Mr. Schneider tested from. He said that those samples were taken from the two outflow pipes located on the property. Correct. Their property. Well, right. No, no, your property. No, their property. Their property. It's LKQ's property. He took it right from the outfalls of their pipes that discharged from their stormwater pollution plant. Well, it's possible that I misunderstood the record, but whatever the record shows, it shows it. Well, that's right. The record does show that that's where he took it, right outside the outfalls of their property. That's what I'm saying. We've met the standard for a Clean Water Act violation. There was TPH and oil in the water. There was violation of the turbidity requirements. They failed to document that they complied with the turbidity. The last documentation shows they had 18 percent compliance with the turbidity in December of 2011. They failed to document the required maintenance that they were supposed to do under the multi-sector general permit and the RIPTES permit. Was there anything in the record that the judge could have relied on for her finding that the water being tested was from five different sources? There was testimony that five different sources contributed. Well, actually, there wasn't. There was testimony that four different sources contributed to that discharge channel. The only sources that contributed were the headwalls, swales. Further down the channel, there is a discharge pipe that comes from the other side of Curran Road and discharges water. And then Curran Brook runs along the plaintiff's property, which was perpendicular to this discharge channel. So those are the only sources that come into the discharge channel. There's no five sources. And the testing was specifically done right outside of the discharge channel coming from the defendant's property. And that's where these exceedances of the CWA were found. So the judge made an error in determining that there was five sources contributing to where the testing was done. Well, whether there were four or five is really almost irrelevant. The point is that the person that did the testing claimed that the waters at the point that he tested were already mixed from good and bad sources. He did not, Judge. He said he took the testing right outside of the headwall of the defendant's property and that the only thing that was flowing at the time were the pipes from the defendant's property, the headwall, and there was a small discharge coming from a swale, which the defendants had created as part of their stormwater pollution plan in this case. That was it. That's what his testimony was at trial. Okay. Thank you. I have nothing further. The rest of my brief. Thank you, Counsel. Mr. Clark? Or Mr. Corente? Thank you, Your Honors. Good morning. Robert Corente on behalf of the appellee. I think most logically, Your Honors, the three issues raised by the appellants in this matter can be addressed in inverse order. Turning first to the exclusion of the late expert report, as this Court has recognized repeatedly under Rule 37, the exclusion of a late report such as this is virtually automatic under most circumstances, unless it can be shown that the late disclosure was harmless and or substantially justified. It's our position that this was neither. There was a massive difference between the disclosure report that we were provided at the deadline established by the pretrial order and the quote-unquote supplemental order, which we received some four months later. You should note that there was no leave of court sought to file the late report. There was never a motion made to extend the deadlines involved. And, in fact, we had gone forward and deposed Dr. Rosene on his initial report. We had done a walk-through at the property under the terms of a court order with Dr. Rosene in April. Another two months goes by after that. And after we had filed our motion for summary judgment, an hour or two after that, we now suddenly received this massive supplemental report with new theories, new data, new everything. So that's what the Court was dealing with. There was no justification. There's no justification offered here, and it was just a blatant violation of the pretrial order. I think that it's really beyond question that the Court was well within its discretion in excluding the report. And I would note also that, unlike the Esposito v. Home Depot case, the preclusion order here did not have the effect of ultimate dismissal of the matter. The trial went forward. The case was fully tried to decision. Dr. Rosene did, in fact, testify, but he was confined to the parameters of his initial report rather than the supplemental report. And Dr. Snyder, the plaintiff's other environmental expert, was permitted to testify, again, consistent with the report that he had provided at the deadline. So this was not a death knell preclusion order such as the Court was dealing with in Esposito. Well, what does the record say about the site of the test? In terms of the site of the test, if you look at pages 10 through 12 of Judge Lisi's decision, she goes through the testimony of multiple witnesses in some detail with specific citations to the record. And what the testimony showed was that there are, in fact, five sources that feed this drainage channel. There are two outfall pipes coming off the LKQ property that are built into a rock headwall. One pipe drains the major portion of the underground treatment system. A smaller pipe drains the front parking lot, which is treated by a separate drainage system. So you have those two sources. And then you have a bank or a swale running off Curran Road, which is at that site, a slight downhill. So as the water comes down the hill, down Curran Road, completely untreated, it comes off the road and into that same collection pool and drainage ditch. Is that the site of the testing? Yes. That's the third source. Wait a minute. Counsel is arguing that at the time it was tested that there was very little swale coming from the roadway so that the bulk of any water that was tested would have come from the two pipes. There were multiple different testing dates and testing sites, but if you look at the citations to the record that Judge Lisi makes reference to, the witnesses were asked very specifically, did you test right at the LKQ outfall pipes? And invariably their answer was no, we did not. We tested in an area where the LKQ outfall was already mixed with other sources. You have the untreated water running off Curran Road. You also have a storm drain in the middle of Curran Road, which connects to another pipe that runs into that same ditch. That's your fourth source. And then the fifth source is the intermittent stream that runs on Mr. Paolino's property. They're all feeding into the same culvert that runs under the road. The reason that the... It doesn't matter if they're feeding into the same culvert if the culvert wasn't the source of the test. The question, I mean, we'll have to do a big record dig, but the question is whether, as counsel says, the tests were actually performed in such a way that it would have been clear that the water, any pollutants were coming from your client's property. I think the record is clear, and I think Judge Lisi was very clear in her finding in this regard, that the samples were taken at a point where the sources were already mixed. She found that specifically. That's what the evidence was in the record. And it was for that reason that she held that there had been no case made, as there wasn't, that LKQ was doing anything to contaminate Mr. Paolino's property. In fact, the other evidence that came out with respect to Mr. Snyder's testing was that the intermittent stream that ran along Mr. Paolino's property was a very important source because he had found TPH readings in Mr. Paolino's stream. Mr. Paolino had, in fact, been ordered by the DEM to excavate and remove 1,100 tons of contaminated soil on his own property. So this is a massively contaminated site, and the fact that his stream was also feeding that same collection site was very important evidence. And I think, again, if you look at the record citations from Judge Lisi, the evidence is abundantly clear and really even uncontested. There was no specialized or targeted testing of the outfall pipes just coming from the LKQ property. Well, counsel, that then raises the question of why. It would seem if you're trying to test outfall from a particular property, you would somehow do the testing right there where the outfall pipes came out. Are you saying it's your opponent's doing to have done that, and they just simply didn't do it? That's exactly right. It was their expert who took the samples. And, in fact, there was another gentleman named Lee who was a first witness in the trial. He testified that he didn't even realize that there was a pipe coming in from the storm drain, and he hadn't done anything to separate the testing from the different sources. So this issue doesn't turn on what Judge Lisi may have allowed and what she excluded. So this, the sites that you're referring to, refer to evidence in the record that was actually allowed. I'm sorry, I didn't hear the last part. That was actually, refers to evidence in the record that was actually, it's just, it's odd that the plaintiffs wouldn't know where there, or the plaintiffs' experts wouldn't know where to test. It's just odd. We thought it was odd, too, but that's what happened. And that was our cross-examination, that these tests were essentially useless because they were testing from a mixed source. So that was one of three issues that the plaintiffs raised with respect to the actual factual findings on the merits. The second argument that they've raised here has to do with the turbidity readings. Now, when the stormwater system was initially designed, it was not designed in accordance with what DEM asked for. They didn't ask for turbidity control. After the fact, they said, by the way, we want you to control for turbidity, too. So this was kind of an add-on that had to be done in the course of the design and implementation of the system. There was a single notice of violation issued by DEM when they got a high turbidity reading. They sent that to our clients. The system was tweaked. The problem was fixed. And my clients were assessed an administrative penalty for what was called a minor violation. They paid $2,500. And after that, DEM went out and investigated innumerable complaints, all of which came from Mr. Paolino, complaining about high turbidity. In every other instance in which they went out and looked into these allegations, they determined that the allegations were baseless. And they wrote to Mr. Paolino over and over and over again. The gentleman from DEM all testified. The correspondence was all in evidence. They said, we found one violation. We issued the NOV. They fixed the problem. They paid the fine. Circumstances like this, under the Gwaltney case and this court's progeny following Gwaltney, it's clear that the Clean Water Act is regarded as an interstitial statute. It is not to take the place of administrative control and enforcement. It's only to fill in where the state refuses to enforce the law. That's not what happened here. The action taken by Rhode Island DEM, we think, precludes the assertion of a Clean Water Act case. And third, with respect to the change of name and the technical violation having to do with that, the testimony at trial was that DEM knew that the license had been transferred from one entity to another. There was correspondence we put in the record showing that they were writing to the correct entity. There was no dispute about that. The issue was that there were multiple different offices from DEM that weren't talking to each other. So if Office 1 knew but Office 3 didn't know, we hadn't given separate disclosure about the transfer to Office 3. But there was no confusion whatsoever. And the DEM witnesses testified at trial. We knew exactly who was involved. This is a made-up basis for a Clean Water Act violation. And finally, with respect to the imposition of attorney's fees, I think the court was well within its discretion as provided under the statute. I think the court went out of her way to give the plaintiffs the benefit of the doubt there. And she found that even if it was filed in good faith and even if it was not objectively unreasonable at the outset, at a certain point in time, once they had tried the case and lost in the state court, once they had signed a stipulation dismissing their Clean Water Act case, once the state-of-the-art system had been built and accepted by DEM, at a certain point in time, this becomes exposed as simply a vendetta. This is not about protecting the nation's waterways. This is just part of an ongoing seven-year vendetta. Is there something pending in the State Supreme Court? There's an appeal pending in the State Supreme Court. And Mr. Palino has just filed yet another action. He's just sued the engineers that built the stormwater system. And that's now pending in the state court. This just never ends. What's the status of the case before the Supreme Court? There are actually two appeals pending there. There's an appeal from the decisions by Judge Hurst and the jury on the main action that was tried. And then there was a Rule 11 violation by another lawyer for Mr. Palino. That has been appealed, and the Rhode Island Supreme Court has consolidated those two appeals. We've had the pre-briefing conference with Justice Goldberg, and she anticipates that the court will not reach that argument for roughly a year. Thank you. Thank you.